UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

LOCAL 406 INTERNATIONAL
BROTHERHOOD OF TEAMSTERS
GENERAL TEAMSTERS,

              Plaintiff,          Case No. 1:05-CV-273

v.                                        Hon. Gordon J. Quist

FIVECAP, INC OF MICHIGAN CORP.,

              Defendant.
_____/

## **OPINION**

Plaintiff Teamsters Union Local 406 ("the union") filed a complaint against Defendant FiveCAP Inc. ("FiveCAP") to enforce an arbitration award entered in Plaintiff's favor. Defendant then filed a counter-complaint seeking to vacate the arbitrator's award. Now before the Court are Defendant's motion for summary judgment to dismiss Plaintiff's complaint and to vacate the arbitrator's award and Plaintiff's cross motion for summary judgment to dismiss Defendant's counter-complaint and to enforce the arbitrator's award. For the following reasons, the Court will deny Defendant's motion for summary judgment and grant Plaintiff's motion for summary judgment.

### I. Background

FiveCAP is a non-profit community action agency appointed by several counties in western Michigan to administer their anti-poverty programs, including Head Start programs. Teamsters Local 406 represents in a bargaining unit Head Start specialists and other teachers who work for FiveCAP. On behalf of its members, Teamsters Local 406 entered into a

collective bargaining agreement with FiveCAP. For the purposes here, the agreement contains four pertinent provisions:

> Article VI, Section 3, provides:
>
> The arbitrator's powers shall be limited to the application and interpretation of this Agreement as written. The arbitrator shall be governed at all times wholly by the terms of this Agreement. The arbitrator shall have no power or authority to alter or modify this Agreement in any respect . . . or any authority to hear and determine any dispute involving the exercise of any of FiveCAP's inherent rights not specifically limited by the express terms of this Agreement. Further, the arbitrator shall not be empowered to consider any question or matter outside this Agreement . . . . If the issue of arbitrability is raised, the arbitrator shall only decide the merits of the grievance if arbitrability is affirmatively decided.

Article X is entitled "Probation." It contains three relevant sections. Section 1 provides that "[t]he initial period of employment for Head/Home & Community Support shall be six (6) months . . . ." Section 3 provides that "[a]n employee in the probationary period of employment status may be terminated or discharged without notice or cause and without regard to and without recourse to this Agreement." Finally, Section 4 provides:

> Probationary employees may have their probationary status extended for poor job performance or other good cause, but only upon written notice being mailed to the Union within ten (10) working days prior to the termination of the probationary period. If the Union fails to object to the extension prior to the end of the probationary period, the extension shall be deemed granted. If an employee is discharged as a result of the Union's refusal to consent to the extension, the discharged employee will have no recourse though [sic], and may not avail himself/herself of, the grievance or arbitration procedures.

FiveCAP hired Kristi Larsen as a Head Start Specialist on February 11, 2002. Larsen's probationary period was to expire on August 11, 2002, six months from her February 11, 2002 hire date. FiveCAP maintained that on July 24, 2002, within ten working days of August 11, 2002, it sent a letter to the union requesting an extension of Larsen's probationary period. The union, however, asserts that it never received such a letter. It is undisputed that on August 9,

2002, the union did receive a letter from FiveCAP seeking to extend Larsen's probationary period. FiveCAP maintains that it sent the August 9, 2002, letter in error, as it had mailed a letter on July 24, 2002, noticing the union of its intent to extend Larsen's probationary period. The union refused to consent to an extension of Larsen's probationary period because it asserted that FiveCAP's August 9, 2006, letter failed to provide timely notice of its intent to extend her probationary period. In response, FiveCAP maintained that its July 24, 2002, letter provided timely notice of its intent to extend Larsen's probation and that, if the union refused to consent to the extension of her probationary period, it would terminate Larsen as permitted by the agreement. The union refused to consent to the extension of Larsen's probationary period, and FiveCAP terminated her on October 31, 2002.

The union then grieved Larsen's dismissal. The grievance was heard before an arbitrator. The union argued that since FiveCAP failed to provide timely notice of its intent to extend Larsen's probationary status within ten days prior to the termination of her probationary period, her probationary period expired on August 11, 2002. Since she was no longer a probationary employee, the union asserted, FiveCAP could not discharge her for the union's refusal to extend her probationary period. In response, FiveCAP argued that the letter it sent to the union on July 24, 2002, provided timely notice of its intent to extend her probationary status. The union's refusal to consent to the extension of her probationary period, FiveCAP maintained, entitled it pursuant to the agreement to terminate her.

The arbitrator found that the evidence presented at the hearing strongly contradicted FiveCAP's contention that on July 24, 2002, it sent a letter to the union seeking to extend Larsen's probationary period. The arbitrator concluded that since FiveCAP's August 9, 2002, letter did not timely extend Larsen's probationary period, her probationary status expired on

August 11, 2002, and that, since she was no longer a probationary employee, FiveCAP could not terminate her on the basis of the union's refusal to consent to the extension of her probationary status. The arbitrator, therefore, granted the union's grievance.

## II. Standard of Review for Arbitration Award

The standard for review of arbitration awards is "one of the narrowest standards of judicial review in all of American jurisprudence." *Tenn. Valley Auth. v. Tenn Valley Trades & Labor Council*, 184 F.3d 510, 514-15 (6th Cir. 1999) (quoting *Lattimer-Stevens Co. v. United Steelworkers of Am., Dis. 27*, 913 F.2d 1166, 1169 (6th Cir. 1990)) (internal quotation marks omitted). In reviewing an award, a court's scope of review is limited to determining whether "the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38, 108 S. Ct. 364, 371 (1987). So long as the arbitrator's award "draws its essence from the collective bargaining agreement" and is not merely the arbitrator's "own brand of industrial justice," the award must be upheld. *Id.* at 36, 108 S. Ct. at 370 (internal quotations omitted).

> [T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns [a] construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his.

*United Steelworkers of Am. v. Enter. Wheel & Car Co.*, 363 U.S. 593, 599, 80 S. Ct. 1358, 1362 (1960). Thus, while an arbitrator is accorded wide latitude in construing a collective bargaining agreement, the arbitrator's interpretation and award must be grounded in the language of the contract. *Misco*, 484 U.S. at 38, 108 S. Ct. at 371. The Sixth Circuit has held that an arbitrator's award fails to draw its essence from the collective bargaining agreement when:

> "(1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement."

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Dana Corp.*, 278 F.3d 548, 554 (6th Cir. 2002) (quoting *MidMichigan Reg'l Med. Ctr.– Clare v. Prof'l Employees Div. of Local 79*, 183 F.3d 497, 502 (6th Cir. 1999)).1

### III. Discussion

FiveCAP does not challenge the arbitrator's determination that it failed to give the union timely notice of its intent to extend Larsen's probationary period.2  Rather, FiveCAP argues that, even though it failed to give timely notice of its intent to extend Larsen's probation, and even though, as a consequence of its failure, Larsen's probationary period expired on August 11, 2002, Article X, Section 4, nonetheless entitled it to request an extension of her "probation" and that the union's refusal to agree to the extension constituted a proper ground for dismissal.

---

[1] FiveCAP maintains that "[w]here, as here, the issue is the substantive jurisdiction of an arbitrator under a collective bargaining agreement to decide a dispute, the standard" of review "is not as deferential." (Def.'s Br. Supp. Mot. Summ. J. at 12.)  FiveCAP recognizes that since "arbitration is a matter of contract," "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S. Ct. 1347, 1353 (1960). Moreover, the question of arbitrability, that is, whether a collective bargaining agreement creates a duty for the parties to arbitrate the particular grievance, is an issue "for judicial determination." *AT&T Tech. v. Commc'n Workers of Am.*, 475 U.S. 643, 649, 106 S. Ct. 1415, 1418 (1986).  In this case, the collective bargaining agreement provides for arbitration of any grievance "involving the application, interpretation, or enforcement of the provisions of this agreement."  It is undeniable that the dispute here involves the interpretation of the agreement.  Moreover, while the agreement provides that probationary employees may not avail themselves of the agreement's arbitration procedures, the agreement also provides that if the issue of arbitrability is raised, the arbitrator is to determine whether the dispute is arbitrable.  Therefore, the highly deferential standard outlined above applies here.  *See Vic Wertz Distrib. Co. v. Teamsters Local 1038*, 898 F.2d 1136, 1140 (6th Cir. 1990) (noting that an "arbitrator's decision on arbitrability will be affirmed unless it fails to 'draw its essence from the collective bargaining agreement'") (citations omitted).

[2] The plain meaning of mailing the notice "within ten (10) working days prior to the termination of the probationary period," standing alone, would seem to mean that the notice could have been mailed on August 9, 2002, and still have been timely because the notice would have been mailed within the ten days prior to the termination of the probationary period.  A notice mailed on July 24, 2002, would have been outside of the ten days.  Other provisions in the collective bargaining agreement, however, detract from this interpretation, and the parties seem to agree with the arbitrator's interpretation of the agreement as to the last date by which the notice had to be sent  – "not later than Friday, July 26, 2002." (Arbitrator's Decision, p. 26.)  At least, that interpretation is not an issue brought to the court's attention by FiveCAP.

In support of its position that Article X, Section 4, entitled it to terminate Larsen for the union's refusal to agree to an extension of her probationary period even though she became an employee on August 11, 2002, FiveCAP asserts that it "contemplated that there may be instances in which an employee may have passed his or her probationary period by the time FiveCAP received notice" from the union of the union's objection to its request for an extension of probation and had an opportunity to determine whether to discharge the employee, since the union's deadline to object to an extension of a probationary period was not until the last day of the probationary period. (Def.'s Br. Supp. Mot. Summ. J. at 6.) As a result, FiveCAP maintains, it "specifically negotiated" the provision in Article X, Section 4, that provides that "[i]f an employee is discharged as a result of the Union's refusal to consent to . . . [a probation] extension, the discharged employee . . . may not avail himself/herself of . . . the grievance or arbitration procedures." (*Id*.) "Under this provision," FiveCAP maintains, "even if an employee was *not* probationary at the time of her discharge, the employee is nonetheless contractually forbidden to avail herself of the grievance/arbitration procedures if he or she was discharged as a result of the Union's refusal to consent to a probation extension." (*Id*. at 14) (emphasis added by FiveCAP).  Finally, FiveCAP argues that Article X, Section 4, does not apply solely to probationary employees.  FiveCAP notes that the last sentence of Section 4 "says an 'employee,'" not a "probationary employee." (*Id*. at 14 n.10.)  Moreover, FiveCAP asserts, if Article X, Section 4, were read to apply solely to probationary employees, this section would be "redundant" since Article X, Section 3, already provides that probationary employees do not have access to the agreement's arbitration procedures.

The Court concludes that it cannot be said that the arbitrator failed to even arguably construe the agreement by not adopting FiveCAP's interpretation of Article X, Section 4.

6

FiveCAP's interprets this section as providing that an employee who is no longer a probationary employee may nonetheless be discharged if the union refuses to consent to the extension of the employee's "probation." Read reasonably, Article X, Section 4, is not susceptible to such an interpretation. Article X of the agreement is entitled "Probation." Section 4 of Article X, it is worth to recall, provides:

> Probationary employees may have their probationary status extended for poor job performance or other good cause, but only upon written notice being mailed to the Union within ten (10) working days prior to the termination of the probationary period. If the Union fails to object to the extension prior to the end of the probationary period, the extension shall be deemed granted. If an employee is discharged as a result of the Union's refusal to consent to the extension, the discharged employee will have no recourse though [sic], and may not avail himself/herself of, the grievance or arbitration procedures.

FiveCAP focuses on the last sentence of this section to the exclusion of the rest of the language. When read in context, the sentence simply provides that when FiveCAP provides *proper* notice of its intent to extend an employee's probationary period, and when the union objects to the extension request, then FiveCAP may discharge the employee as a result of the union's objection to the extension and the employee will then have no recourse through arbitration.

The rationales proffered by FiveCAP in support of its alternative interpretation of this section are unpersuasive. FiveCAP maintains that the last sentence of Section 4 was "specifically negotiated" to apply to "employees" because it was contemplated that there would be instances in which a probationary employee would have passed his probationary period by the time FiveCAP had the opportunity to determine whether to discharge the employee where the union objects to a probation extension. While it is undoubtedly true that an employee may pass her probationary end-date by the time FiveCAP has the opportunity to determine whether to discharge the employee after the union objects to the extension of the employee's probation, this

7

argument wholly ignores Section 4's requirement that FiveCAP provide timely notice of its intent to extend the employee's probation.  If FiveCAP had provided timely notice of its intent to extend Larsen's probation, then it could have discharged her for the union's refusal to consent to an extension of her probation even if the date her probation was to originally expire had passed.  FiveCAP's failure to provide timely notice of its intent to extend Larsen's probation, however, resulted in her probation ending on August 11, 2002.  After failing to provide timely notice, FiveCAP could neither seek an extension of her probation nor terminate her for the union's refusal to consent to an extension of her probation.  If FiveCAP's interpretation of Section 4 were adopted, where it could prevent an employee's probationary period from lapsing even though it failed to give timely notice of its intent to extend the employee's probation, then FiveCAP could presumably always prevent an employee from graduating from her probationary status, as FiveCAP does not explain when it would be required to provide notice of its intent to extend an employee's probationary period.

FiveCAP's argument that if Section 4 were interpreted to apply solely to probationary employees, it would render Section 3 redundant, is likewise unpersuasive.  Section 3 provides that "[a]n employee in the probationary period of employment status may be terminated or discharged without notice or cause and without regard to and without recourse to this Agreement."  Section 4, on the other hand, provides the procedure for extending a probationary period.  This section makes clear, moreover, that so long as FiveCAP provides timely notice of its intent to extend an employee's probationary period, and if the union objects to the request, then FiveCAP may terminate the employee and the employee will not have any recourse through arbitration.

## IV. Conclusion

Since it cannot be said that the arbitrator failed to even arguably construe the collective bargaining agreement by failing to adopt FiveCAP's interpretation of Article X, Section 4, the Court will deny FiveCAP's motion for summary judgment to dismiss the union's complaint and to vacate the arbitrator's award and grant the union's motion for summary judgment to dismiss FiveCAP's counter-complaint and to enforce the arbitrator's award.

An order consistent with this opinion will be entered.


Dated:  August 28, 2006                                         /s/ Gordon J. Quist            
                                                        GORDON J. QUIST
                                        UNITED STATES DISTRICT JUDGE